**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1180
Fax: 212-465-1181
*Attorneys for Plaintiff,*
*FLSA Collective Plaintiffs,*
*and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ALVARO MENDEZ, *on behalf of himself, FLSA Collective Plaintiffs, and the Class,*

Plaintiff,

v.

85 WINE CORP.
f/d/b/a MUNCHIES KORNER
d/b/a GIACOMO'S PIZZA & RESTAURANT,
BEAR NOAH CORP
d/b/a JACQUES BRASSERIE,
HAMIMI JACQUES OUARI,
a/k/a JACQUES OUARI, and
MELISSA OUARI,

Defendants.

---

Case No.:

**CLASS AND COLLECTIVE ACTION COMPLAINT**

Jury Trial Demanded

Plaitiff ALVARO MENDEZ ("Plaintiff"), on behalf of himself and others similarly situated, by and through his undersigned attorneys, hereby files this Class and Collective Action Complaint against Defendants 85 WINE CORP. f/d/b/a MUNCHIES KORNER and d/b/a GIACOMO'S PIZZA & RESTAURANT, BEAR NOAH CORP d/b/a JACQUES BRASSERIE (the "Corporate Defendants"), HAMIMI JACQUES OUARI a/k/a JACQUES OUARI and

MELISSA OUARI (the "Individual Defendants") (each individually, a "Defendant," or collectively the "Defendants"), and states as follows:

## INTRODUCTION

1. Plaintiff alleges, pursuant to the Fair Labor Standards Act as amended, 29 U.S.C. §§201 *et. Seq.* ("FLSA"), he and others similarly situated are entitled to recover from Defendants: (1) unpaid overtime premiums, due to an illegal fixed salary scheme; (2) liquidated damages; and (3) attorney's fees and costs.

2. Plaintiff further alleges that, pursuant to the New York Labor Law ("NYLL"), he and others similarly situated are entitled to recover from Defendants: (1) unpaid minimum wages, due to an illegal fixed salary scheme; (2) unpaid overtime premiums, due to an illegal fixed salary scheme; (3) unpaid spread of hours premiums; (4) statutory penalties; (5) liquidated damages; and (6) attorney's fees and costs.

3. Plaintiff additionally alleges that, pursuant to the Internal Revenue Code, 26 U.S.C. § 7434 ("IRC"), he and others similarly situated are entitled to relief of damages, fees, and costs in this matter because Defendants willfully filed fraudulent tax information forms with the Internal Revenue Service.

4. Plaintiff further alleges, on behalf of himself and others similarly situated, that Defendants breached their contractual obligations by failing to pay employer payroll taxes as required by the Federal Insurance Contribution Act ("FICA").

5. Plaintiff also alleges that, in retaining the above employer payroll tax sums for themselves, Defendants unjustly enriched themselves at the expense of Plaintiff and Class Members.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this controversy pursuant to 29 U.S.C. §216(b), 28 U.S.C. §§1331, 1337, and 1343 and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

7. Venue is proper in the Southern District pursuant to 28 U.S.C. §1391.

8. Although Plaintiff has signed an arbitration agreement with Defendants, venue is still proper, since Defendants have failed to adhere to the agreement to arbitrate. When Plaintiff first served Defendants with notice of his claims, Defendants produced his signed arbitration agreement, at which point the parties proceeded to arbitration with Judicial Arbitration and Mediation Services ("JAMS"). Plaintiff filed his Arbitration Demand with JAMS on July 18, 2025 and timely paid all arbitration fees required of him (the "Arbitration"). Defendants paid their portion of the initial filing fee, but thereafter refused to pay the arbitration fees required by JAMS. As a result of Defendants' nonpayment, JAMS administratively closed the Arbitration on January 16, 2026, leaving Plaintiff with no recourse but to file the instant lawsuit. Defendants have abdicated their right by contract to arbitration and venue is thus proper in the Southern District.

9. The IRS will be notified of this Complaint as the Internal Revenue Code requires. Specifically, the Internal Revenue Code provides that "[a]ny person bringing an action under [26 U.S.C. § 7434] Subsection (a) shall provide a copy of the complaint to the IRS upon the filing of such complaint with the court." 26 U.S.C. § 7434(d).

## THE PARTIES

10. At all relevant times herein, Plaintiff MENDEZ was and is a resident of Bronx County, New York.

11. Corporate Defendant 85 WINE CORP. f/d/b/a MUNCHIES KORNER d/b/a GIACOMO'S PIZZA is a domestic business corporation organized under the laws of the State of New York, with a principal place of business located at 1505 3rd Avenue, New York, NY, 10028.

12. Corporate Defendant BEAR NOAH CORP. d/b/a JACQUES BRASSERIE is a domestic limited liability company organized under the laws of the State of New York, with a principal place of business and address for service of process located at 204 East 85th Street, New York, NY, 10028.

13. Throughout the relevant period, Defendants severally and/or jointly owned and operated two restaurants, which are located next to each other on the same corner, at the following locations:

i. "Giacomo's Pizza" (formerly "Munchies Korner" until sometime in October 2022) - 1505 3rd Avenue, New York, NY, 10028 (hereby, "Giacomo's"); and

ii. "Jacques Brasserie" - 204 East 85th Street, New York, NY, 10028 (hereby, "Jacques").

14. Individual Defendant HAMIMI JACQUES OUARI was the founder and owner of both Giacomo's and Jacques. At all relevant times, Individual Defendant HAMIMI JACQUES OUARI operated Giacomo's through Corporate Defendant 85 WINE CORP., and Jacques through Corporate Defendant BEAR NOAH CORP.

15. Individual Defendant MELISSA OUARI was the founder and owner of both Giacomo's and Jacques. At all relevant times, Individual Defendant MELISSA OUARI operated Giacomo's through Corporate Defendant 85 WINE CORP., and Jacques through Corporate Defendant BEAR NOAH CORP. Individual Defendant MELISSA OUARI was the principal listed on Defendants' liquor licenses.

16. Upon information and belief, in or around November 2024, Giacomo's was sold to Moez [LNU], who currently operates Giacomo's through Giacomo's Pizza & Restaurant Corp (the "Sale"). As of this date, Giacomo's food service and liquor licenses are still currently licensed to Corporate Defendant 85 WINE CORP.

17. At all relevant times, each Corporate Defendant had gross annual revenues in excess of $500,000.00 and engaged in interstate commerce. Therefore, at all relevant times, each Corporate Defendant was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA, the NYLL, and all regulations thereunder.

18. At all relevant times, the work performed by Plaintiff, FLSA Collective Plaintiffs and Class Members was directly essential to the business operated by Defendants.

19. At all relevant times, Defendants employed at least 40 employees as defined under the NYLL.

20. At all relevant times, Defendants were employers of Plaintiff, FLSA Collective Plaintiffs, and Class Members within the meaning of NYLL §§ 2 and 651.

***<u>Individual Defendant HAMIMI JACQUES OUARI's liability</u>***

21. At all relevant times, Individual Defendant HAMIMI JACQUES OUARI was the owner, operator, founder, and Chief Executive Officer of Corporate Defendants 85 WINE CORP. and BEAR NOAH CORP.

22. At all relevant times, Individual Defendant HAMIMI JACQUES OUARI exercised direct and actual control over the employment terms and conditions of all employees of Jacques, including FLSA Collective Plaintiffs and Class Members.

23. At all times during the applicable Class Period (defined below), Individual Defendant HAMIMI JACQUES OUARI exercised direct and actual control over the employment

terms and conditions of all employees of Giacomo's, including Plaintiff, FLSA Collective Plaintiffs, and Class Members.

24. At all relevant times, Individual Defendant HAMIMI JACQUES OUARI held and exercised the direct and actual power and authority to (i) employ and terminate all employees and managers, (ii) determine their hourly rates or salaries, frequencies of payments, and means of payments, (iii) establish, alter, or otherwise affect their work schedules, (iv) otherwise directly or indirectly affect the qualities of their employments, and (v) directly or indirectly maintain their employment records.

25. At all relevant times during the applicable Class Period, Individual Defendant HAMIMI JACQUES OUARI frequently visited Giacomo's and Jacques to (i) inspect the operations and quality of food, service, and hygiene of the two restaurants, (ii) meet and confer with managers to discuss operations, sales, and overall status of business, (iii) pick up or drop off supplies, ingredients, or paperwork, (iv) personally supervise employees (including Plaintiff, FLSA Collective Plaintiffs, and Class Members) and managers, and monitor their individual performances of duties and behaviors, and (v) directly or indirectly reprimand any employees (including Plaintiff, FLSA Collective Plaintiffs, and Class Members) or managers who did not perform their duties sufficiently or correctly, or displayed inappropriate behavior.

26. At all relevant times, Plaintiff, FLSA Collective Plaintiffs, and Class Members could each complain to Individual Defendant HAMIMI JACQUES OUARI (via direct contact during his visits to employees' relevant restaurant) directly regarding any of the terms of their employments, and Individual Defendant HAMIMI JACQUES OUARI would have the authority to directly and actually affect any changes to the quality and terms of their employments.

27. At all relevant times, Individual Defendant HAMIMI JACQUES OUARI exercised direct and actual functional control over the business and financial operations of Corporate Defendants 85 WINE CORP. and BEAR NOAH CORP.

28. At all relevant times, Individual Defendant HAMIMI JACQUES OUARI's role and decisions made in connection to his role directly affected the nature, conditions, and circumstances of Plaintiff's, FLSA Collective Plaintiffs', and Class Members' employments.

***Individual Defendant MELISSA OUARI's liability***

29. At all relevant times, Individual Defendant MELISSA OUARI was the owner, operator, and founder of Corporate Defendants 85 WINE CORP. and BEAR NOAH CORP.

30. At all relevant times, Individual Defendant MELISSA OUARI exercised direct and actual control over the employment terms and conditions of all employees of Jacques, including FLSA Collective Plaintiffs and Class Members.

31. At all times during the applicable Class Period, Individual Defendant MELISSA OUARI exercised direct and actual control over the employment terms and conditions of all employees of Giacomo's, including Plaintiff, FLSA Collective Plaintiffs, and Class Members.

32. At all relevant times, Individual Defendant MELISSA OUARI held and exercised the direct and actual power and authority to (i) employ and terminate all employees and managers, (ii) determine their hourly rates or salaries, frequencies of payments, and means of payments, (iii) establish, alter, or otherwise affect their work schedules, (iv) otherwise directly or indirectly affect the qualities of their employments, and (v) directly or indirectly maintain their employment records.

33. At all relevant times during the applicable Class Period, Individual Defendant MELISSA OUARI frequently visited Giacomo's and Jacques to (i) inspect the operations and

quality of food, service, and hygiene of the two restaurants, (ii) meet and confer with managers to discuss operations, sales, and overall status of business, (iii) pick up or drop off supplies, ingredients, or paperwork, (iv) personally supervise employees (including Plaintiff, FLSA Collective Plaintiffs, and Class Members) and managers, and monitor their individual performances of duties and behaviors, and (v) directly or indirectly reprimand any employees (including Plaintiff, FLSA Collective Plaintiffs, and Class Members) or managers who did not perform their duties sufficiently or correctly, or displayed inappropriate behavior.

34. At all relevant times, Plaintiff, FLSA Collective Plaintiffs, and Class Members could each complain to Individual Defendant MELISSA OUARI (via direct contact during his visits to employees' relevant restaurant) directly regarding any of the terms of their employments, and Individual Defendant MELISSA OUARI would have the authority to directly and actually affect any changes to the quality and terms of their employments.

35. At all relevant times, Individual Defendant MELISSA OUARI exercised direct and actual functional control over the business and financial operations of Corporate Defendants 85 WINE CORP. and BEAR NOAH CORP.

36. At all relevant times, Individual Defendant MELISSA OUARI's role and decisions made in connection to her role directly affected the nature, conditions, and circumstances of Plaintiff's, FLSA Collective Plaintiffs', and Class Members' employments.

***Defendants' Single Integrated Enterprise***

37. At all periods of time before the Sale, Defendants operated the two restaurants collectively as a single integrated enterprise. Specifically, the two restaurants were engaged in related activities, had a common business purpose, shared common ownership and management, and utilized a centralized control of labor relations and human resources.

38. At all periods of time before the Sale, Giacomo's and Jacques were commonly owned through the common control of Individual Defendants HAMIMI JACQUES OUARI and MELISSA OUARI, who held an executive position in 85TH WINE CORP. and BEAR NOAH CORP, the two entities that operated Giacomo's and Jacques during this time.

39. Individual Defendants HAMIMI JACQUES OUARI and MELISSA OUARI founded, opened, and operated Giacomo's and Jacques with a common business purpose: to generate profit for themselves by providing desirable dining experiences.

40. At all periods of time before the Sale, Giacomo's and Jacques were directly related through Defendants' business activities. Specifically, at all relevant times, Defendants transferred and interchanged employees, supplies, ingredients, and other goods between Giacomo's and Jacques. Throughout Plaintiff's employment, Plaintiff was routinely required by Defendants to personally transfer supplies, ingredients, and other goods between Giacomo's and Jacques. Additionally, Plaintiff frequently observed employees interchange between locations and work shifts at both locations. At all relevant times, Defendants' transferring of employees and supplies was necessary for optimal operation of Giacomo's and Jacques as it allowed Defendants to extend their ability to make food and provide service. Individual Defendant OUARI located Giacomo's and Jacques directly next to each other in order to facilitate easier transferring of employees and supplies.

41. At all periods of time before the Sale, Defendants and/or their human resources department commonly managed labor relations for all employees of Giacomo's and Jacques (including Plaintiff, FLSA Collective Plaintiffs, and Class Members).

42. At all periods of time before the Sale, Defendants and/or their payroll department commonly managed the payroll for all employees of Giacomo's and Jacques (including Plaintiff,

FLSA Collective Plaintiffs, and Class Members).

43. Although Plaintiff did not work for Jacques, Jacques and its' controlling entity (Defendant BEAR NOAH CORP) are still appropriately named in the Complaint through the theory of a "single integrated enterprise". At all periods of time before the Sale, Giacomo's and Jacques shared: (i) common ownership by Individual Defendants HAMIMI JACQUES OUARI and MELISSA OUARI, (ii) an interrelation of operations as shown through the exchange of employees, supplies, and ingredients, (iii) a centralized control of labor relations by Defendants; (iv) common management by Individual Defendants HAMIMI JACQUES OUARI and MELISSA OUARI; (v) a common business purpose; and (vi) related activities.

**FLSA COLLECTIVE ACTION ALLEGATIONS**

44. Plaintiff brings claims for relief as a collective action pursuant to FLSA Section 16(b), 29 U.S.C. § 216(b), on behalf of all non-exempt employees, including but not limited to cooks, chefs, porters, runners, bussers, food preparers, dishwasher, waiters, servers, among others, employed by Defendants on or after the date that is six years before the filing of the Complaint in this case as defined herein ("FLSA Collective Plaintiffs").

45. At all relevant times, Plaintiff and FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay them all wages owed, including overtime compensation at the rate of one and one half times the regular hourly rate for work in excess of forty (40) hours per workweek. The claims of Plaintiff stated herein are essentially the same as those of FLSA Collective Plaintiffs.

46. The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to § 16(b) of the FLSA, 29 U.S.C. § 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided to the FLSA Collective Plaintiffs via first class mail to the last address known to Defendants.

## RULE 23 CLASS ALLEGATIONS

47. Plaintiff brings claims for relief pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of all non-exempt employees, including but not limited to cooks, chefs, porters, runners, bussers, food preparers, dishwasher, waiters, servers, among others, employed by Defendants within the Class Period (defined below) (the "Class" or "Class Members").

48. For the purpose of this litigation, the Class Period is defined herein:

i. For employees who only worked at Giacomo's: six years before the filing of the Complaint in this case until the Sale;

ii. For other employees: six years before the filing of the Complaint in this case.

49. The Class Members are readily ascertainable. The number and identity of the Class Members are determinable from the records of Defendants. The hours assigned and worked, the position held, and rates of pay for each Class Member are also determinable from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23.

50. The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the

precise number of such persons is unknown, as the facts on which the calculation of that number rests are presently within the sole control of Defendants, there is no doubt that there are more than forty (40) members of the Class.

51. Plaintiff's claims are typical of those claims, which could be alleged by any member of the Class, and the relief sought is typical of the relief, which would be sought by each member of the Class in separate actions. All the Class Members were subject to the same corporate practices of Defendants, as alleged herein, of failing to (i) pay statutory minimum wages, (ii) pay overtime compensation, (iii) compensate spread of hours premiums, (iv) provide proper wage statements per requirements of the New York Labor Law, and (v) provide proper wage and hour notices per requirements of the New York Labor Law. Defendants' corporate-wide policies and practices affected all Class Members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class Member. Plaintiff and other Class Members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

52. Plaintiff is able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the Class. Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

53. A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendant. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the

unnecessary duplication of efforts and expense that numerous individual actions engender. Because losses, injuries, and damages suffered by each of the individual Class Members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

54. Defendants and other employers throughout the state violate the New York Labor Law. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide Class Members who are not named in the Complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

55. There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including:

a) Whether Defendants employed Plaintiff and Class Members within the meaning of NYLL;

b) What are and were the policies, practices, programs, procedures, protocols and plans of Defendants regarding the types of work and labor for which Defendants did not pay the Class Members properly;

c) At what common rate, or rates subject to common methods of calculation, was and are Defendants required to pay Plaintiff and Class Members for their work;

d) Whether Defendants paid Plaintiff and Class Members the proper minimum wage, as mandated by the NYLL;

e) Whether Defendants properly notified Plaintiff and Class Members of their regular hourly rate and overtime rate;

f) Whether Defendants paid Plaintiff and Class Members the proper overtime compensation at the premium rate of one and one-half times the regular rate of pay, under NYLL;

g) Whether Defendants paid Plaintiff and Class Members their owed spread of hours premiums for hours worked over ten in a single day;

h) Whether Defendants failed to withhold taxes from the wages of Plaintiff and the Class;

i) Whether Defendants provided Plaintiff and the Class with accurate tax statements for each tax year that they worked;

j) Whether Defendants provided proper wage statements to Plaintiff and Class Members per requirements of NYLL; and

k) Whether Defendants provided proper wage and hour notices to Plaintiff and Class Members per requirements of NYLL.

## STATEMENT OF FACTS

***Plaintiff's Employment Background***

56. In or around January 2021, Plaintiff was hired by Defendants to work as a Cook at their restaurant MUNCHIES KORNER, located at 1505 3rd Avenue, New York, NY, 10028. In or around October 2022, the restaurant was rebranded to Giacomo's Pizza, and Plaintiff continued working for Defendants and their new brand. Plaintiff's employment with Defendants ended in or around November 2024, when Defendants sold Giacomo's. Plaintiff's employment at Giacomo's was then transferred to the new owner and Plaintiff worked there until in or around February 2025.

57. At all relevant times, Plaintiff was scheduled by Defendants to work twelve (12) hours per day from 10:00 a.m. to 10:00 p.m. for six (6) days per week, Wednesdays through Mondays, for a total of seventy-two (72) hours per week. FLSA Collective Plaintiffs and Class Members were scheduled to work similar hours.

58. At all relevant times, Plaintiff was compensated by Defendants at a fixed salary of $1,000.00 per week, regardless of the number of hours Plaintiff worked each week. Plaintiff's pay would not change if he worked a greater or lesser number of hours in any given week. There was never any agreement between Plaintiff and any Defendants that Plaintiff's fixed salary compensation would cover Plaintiff's overtime hours worked. At all relevant times, FLSA Colllective Plaintiffs and Class Members were similarly paid by Defendants at similar fixed salary rates and without any agreement between parties as to those fixed salaries covering the employees' overtime hours.

59. Throughout Plaintiff's employment with Defendants, Defendants paid Plaintiff his first $600.00 by check and his remaining $400.00 in cash. At all relevant times, FLSA Collective Plaintiffs and Class Members were paid by Defendants via similar methods.

***Plaintiff's Unpaid Minimum Wages Claims***

60. Defendants knowingly and willfully operated their business with a policy of not paying Plaintiff and Class Members at or above the minimum wage rates mandated by the NYLL.

61. At all times during his employment, Plaintiff was paid a fixed rate of $1,000.00 per week, regardless of the number of hours worked. Plaintiff was regularly scheduled to work seventy-two (72) hours per week, putting his hourly compensation at $13.89 ($1000 ÷ 72). The mandated minimum wages in New York during Plaintiff's employment with Defendants was $15.00 per hour (2021-2023), and $16.00 per hour (2024). Therefore, Plaintiff was underpaid by Defendants by approximately: $1.11 per hour between 2021 and 2023, and $2.11 per hour throughout 2024.

62. Class Members were similarly paid at fixed rates which resulted in them being paid below the minimum wage.

63. Defendants' conduct was willful as they intentionally chose to schedule and pay Plaintiff and Class Members in a way that clearly resulted in illegal wage rates.

***Plaintiff's Unpaid Overtime Premium Claim***

64. Defendants knowingly and willfully operated their business with a policy of not paying Plaintiff, FLSA Colllective Plaintiffs, and Class Members their proper overtime premium of one-and-a-half times their regular rate.

65. As described herein above, at all relevant times, Defendants paid Plaintiff at a fixed rate of $1,000.00 per week for approximately 72 hours of work per week, with no agreement that such a rate would account for compensation of Plaintiff's overtime hours. FLSA Collective Plaintiffs and Class Members were also paid at a fixed rate for all hours worked, even when they worked more than forty (40) hours in a week.

66. Even had there been an agreement that Plaintiff's fixed weekly salary was intended to compensate Plaintiff's overtime hours, it would have still been in violation of mandatory overtime laws, as 72 hours of work at $15.00 per hour base rate (the lowest applicable minimum rate during Plaintiff's employment) would have come to $1,320.00 per week. Therefore, Defendants' $1000 per week fixed salary failed to include any overtime premiums.

67. However, it is clear that no such agreement existed, as Plaintiff, FLSA Collective Plaintiffs, and Class Members were all paid at fixed rates regardless of how much time they actually worked each week. When Plaintiff worked past his shift or took a sick day, his pay for the week did not change, indicating that Defendants never had any intention for Plaintiff's weekly rate to reflect or be calculated from an hourly rate. As such, Defendant's were effectively paying Plaintiff at a straight rate of $13.89 per hour for every hour worked.

68. Defendants' willful conduct is obvious based on the fact that they chose to schedule Plaintiff, FLSA Collective Plaintiffs, and Class Members for more than forty hours in any given week and to pay them at a straight rate for all hours worked. Additionally, Defendants also chose to pay all overtime hours in cash, enabling them to hide their misconduct by ensuring that no record was created of the illegal rates at which they were paying their employees.

69. Defendants attempted to deny their obligation by listing each employee as salaried on their paystubs. However, Defendants only ever paid employees $600.00 through their weekly paychecks, well under the minimum salary threshold (for example, $1200.00 in 2024) needed to qualify those employees as exempt from overtime requirements. Even taking into account the additional $400.00 paid to each employee in cash, Plaintiff, FLSA Collective Plaintiffs, and Class Members were still paid below the exempt threshold.

***Plaintiff's Spread of Hours Claim***

70. At all times during his employment, Plaintiff was scheduled to work shifts with a spread of hours exceeding ten (10) hours in a workday.

71. Plaintiff's schedule required him to work twelve (12) hours each day. New York State law requires that any non-exempt employee whose workday spans more than ten hours must be paid the equivalent of one hour at the minimum wage. However, Defendants never paid him this spread-of-hours premium for any of the days in which he worked his scheduled twelve hours.

72. Class Members were also not paid the proper spread-of-hours premiums for workdays that spanned more than ten hours.

73. Defendants' conduct was willful because, as with their overtime violations, they knowingly scheduled Plaintiff and Class Members to work for more than ten hours per day without any practice or plan to compensate those employees for their spread-of-hours premiums.

***Plaintiff's WTPA Violation Claims***

74. At all relevant times, Plaintiff and Class Members never received a wage notice from Defendants. They also did not receive proper wage statements from Defendants.

75. In violation of the Wage Theft Protection Act ("WTPA")—incorporated into NYLL—Defendants knowingly and willfully operated their business with a policy of not providing wage notices to Plaintiff and Class Members at the beginning of their employment with Defendants.

76. Defendants further violated the WTPA by failing to provide Plaintiff and Class Members with proper wage statements listing the number of hours worked, their regular hourly rate, overtime rate, any credits taken against the minimum wage, and all deductions.

77. In failing to provide proper wage statements and any wage notices, Defendants have failed to comply with the law in a manner that entails a concrete harm to an interest identified by the New York State legislature. As one Court observed:

> Here, Plaintiffs allege that Defendants failed to furnish them with proper wage notices and statements, as required by NYLL §§ 195(1) and 195(3). These provisions were enacted as part of New York's Wage Theft Prevention Act ("WTPA"), N.Y. Lab. Law § 195, which sought "to expand the rights of employees to seek civil and criminal avenues of remedy for their employers failing to follow labor law appropriately and the specifications therein." N.Y. Spons. Mem., 2010 S.B. 8380. More specifically, the New York State Assembly passed the WTPA to address studies showing that a large number of employees were not being paid the wages owed to them, and that many employers were not adequately informing their employees of their wages and how they are calculated in language the employees could understand. *Id.* The New York State Assembly opined that existing penalties did not adequately deter employers from paying less than the wages owed, and stated that the WTPA would dramatically change this by increasing penalties for violating employees' rights. *Id.*

*Imbarrato v. Banta Mgmt. Servs*., 2020 U.S. Dist. LEXIS 49740, at *21-22 (S.D.N.Y. March 20, 2020)

78. Here, Defendants' failure goes beyond generating a risk of harm to Plaintiff and Class Members. Defendants' conduct actually harmed Plaintiff and Class Members. Defendants' failure to provide wage notices and paystubs listing all hours actually worked and rates of pay, including overtime hours and overtime rates, deprived employees of the ability to contest the pay provided by Defendants, allowed Defendants to hide their wrong-doings, and necessitated the current litigation to vindicate Plaintiff's and Class Members' rights. This conduct ensured Defendants' ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Defendants' failure to provide wage notices and wage statements to employees allowed Defendants to hide their responsibility and deprive employees of timely compensation.

79. Had Defendants provided wage statements to Plaintiff and Class Members which accurately listed the total number of hours Plaintiff and Class Members actually worked and their proper pay rates, as required by law, Defendants would have had to either (a) increase employees' wages to correspond to the hours they actually worked or (b) forthrightly acknowledge, by way of the wage statement, that the employee's wages did *not* correspond to the hours the employees actually worked. Either possibility would have allowed Plaintiff and Class Members to vindicate their rights under the NYLL. The deprivation of these possibilities therefore constitutes an injury.

80. The failure to provide any wage notices and proper wage statements continues to result in delayed payment of all proper wages owed to Plaintiff and Class Members. This delayed payment caused Plaintiff and Class Members to struggle to pay bills and other debts.

81. The direct effect of understating the number of hours an employee worked is to reduce the wages that employees are listed as having earned on their wage statements. The direct effect of this, in turn, is to reduce the employee earnings that the employer later reports to the IRS through the employee's W-2 form, as such information is derived from the information on employees' wage statements. *See Mills v. Mills*, 2021 Minn. Dist. LEXIS 200, at *5 (Minn. Dist. Ct., Anoka County, Tenth Judicial District May 20, 2021) ("Petitioner's gross annual income, based on her 2020 W-2 and paystub dated 12/24/20, is $130,321.30"); *T.F. v. N.F.*, 820 N.Y.S.2d 846, 846 (Sup. Ct., Suffolk Cty., June 22, 2006) ("In 2005 the plaintiff earned $ 133,086 as reflected on his final year paystub and W-2").[1]

---

[1] It is true that the wages reported on W-2 forms are not always precisely identical to those listed on an employees' last paystub for the year. One reason for is, as the IRS explains, that "W-2 wages include: (i) the total amount of wages as defined in section 3401(a); (ii) the total amount of elective deferrals (within the meaning of section 402(g)(3)); (iii) the compensation deferred under section 457; and (iv) the amount of designated Roth contributions (as defined in section 402A)." https://www.irs.gov/pub/irs-drop/rp-19-11.pdf. However, the possibility, that wages listed on a W-2 might be affected by such considerations does not change the fact that the base wages on the W-2 are derived from paystubs. The paystub processing service *realcheckstubs* explains: "A pay stub contains crucial information that assists in calculating W2 wages. Paystub provides gross wages, deductions, taxes withheld, and other income-related

82. The effect of reporting reduced wages on an employees' W-2 is, in turn, to reduce the amount of social security benefits available to the employee, as an employee's entitlement to benefits reflects how much money he or she is reported as having contributed to the social security system. *See McGauran v. Soc. Sec. Comm'n*, 2001 U.S. Dist. LEXIS 3187, at *7 (N.D. Cal. March 19, 2001) ("Social security benefits are based upon the worker's earnings as reported to the [SSA] . . . [and] the worker's earnings are used to determine insured status for entitlement to retirement and to calculate cash benefit rates." (quoting Social Security Administration, Handbook § 1400 (1997)); *Coward v. Zurich Am. Ins. Co.*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) ("Under the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year.'") (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

83. "In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation." *Chen v. Lilis 200 W. 57th Corp.*, 2023 U.S. Dist. LEXIS 38163, at *18 (S.D.N.Y. Mar. 7, 2023). "On the other hand, 'allegations' that go 'beyond asserting a bare statutory violation and sufficiently allege concrete harm' resulting from 'the underpayment of wages' pass muster because 'monetary injury is a concrete harm sufficient for purposes of Article III standing.'" *Thompson v. Elev8 Ctr. N.Y., LLC*, 2023 U.S. Dist. LEXIS 122504, at *21 (S.D.N.Y. July 17, 2023) (quoting *Mateer v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 125017, at *4 (S.D.N.Y. July 14, 2022)).

84. Here, it is clear that Defendants' failure to provide Plaintiff and Class Members with proper wage statements entailed "concrete, downstream consequences" involving monetary injury. Had the number of hours been accurately reported for a given pay period, Defendants would

---

data. Individuals gather the necessary figures required for accurate W2 calculation by referring to the pay stub." https://www.realcheckstubs.com/blog/paystubs/6-steps-how-to-calculate-w-2-wages-from-paystub.

have correspondingly increased the wages due for that period, which in turn would have been reflected in the W-2s that Defendants were supposed to submit to the IRS on behalf of Plaintiff and Class Members. That, in turn, would have increased Plaintiff's and Class Members' entitlement to social security benefits. Because the inaccuracy prevented this outcome, it constitutes an injury sufficient to provide Plaintiff with Article III standing.

85. Courts agree that the misreporting of wages constitutes a concrete injury cognizable under Article III:

> The Seventh Circuit in *Calderon* squarely addressed FICA standing. The plaintiffs in *Calderon* were former employees alleging the employer failed to pay their FICA taxes. 999 F.2d at 1105-06. The Seventh Circuit found that the plaintiffs lacked standing to compel the employer to pay their FICA taxes because "[b]enefits do not. . . depend on whether the employer actually paid the taxes." *Id*. at 1106. Plaintiffs could, however, enforce FICA's reporting requirement because it is the reporting of income that triggers benefits, and losing benefits is an injury under *Lujan*. *Id*. Whether the employer in *Calderon* made FICA payments on the plaintiffs' behalf had no bearing on the plaintiffs' entitlement to benefits. *Id*. "[T]he plaintiff's real interest lies in ensuring that the [employer] make the proper reports of their income." *Id*.

*Coward*, 2011 U.S. Dist. LEXIS 74543, at *3-4.

86. The case at bar is precisely the same situation as in *Coward*, where "it is the reporting of income that triggers benefits, and losing benefits is an injury." *Id*. Plaintiff and Class Members lost benefits by virtue of how Defendants failed to report their income, and how Defendants failed to report employees' income was the direct outcome of the inaccuracies in employees' wage statements. That is why "Plaintiffs have standing to enforce the statutory reporting requirements" imposed by the WTPA. *Calderon v. Witvoet*, 999 F.2d 1101, 1106 (7th Cir. 1993).

87. Whether or not any Class Members are presently eligible for social security benefits is legally immaterial. *See id*. ("Although only citizens and aliens residing in the

United States may receive benefits, 42 U.S.C. § 402(t), plaintiffs may eventually fulfill this requirement and therefore are entitled to keep their Social Security accounts accurate.”).

88. The *Calderon* court stressed that an employee’s interest in ensuring that an employer properly report the employee’s income is amplified by the difficulty of persuading the government to correct errors:

> The practical difficulty is that eligibility for Social Security benefits presumptively depends on reports that employers send to the government. A worker who seeks credit for unreported income bears the burden of proof, 42 U.S.C. § 405(c)(3), (4), which will be hard to carry if the employer has not furnished the customary documentation. The government believes employers who report earnings, because these reports are costly to make--they entail paying a substantial tax. The government tends not to believe undocumented claims by employees, because these claims are essentially costless yet could establish entitlement to large pensions or disability benefits.
>
> All of this means that the plaintiffs' real interest lies in ensuring that the Witvoets make the proper reports of their income. *Id.*

*Calderon v. Witvoet*, 999 F.2d 1101, 1106 (7th Cir. 1993)

89. Here, the problem is not merely challenging but insurmountable. Plaintiff and Class Members cannot even attempt to have their earnings report corrected because Defendants failed to report their actual wages to the IRS. Because “[u]nder the Social Security statute, entitlement depends on ‘the total of the wages paid . . . to an individual in a calendar year,’” Plaintiff was irreversibly injured with respect to his social security benefits as Defendants failed to send her W-2 to the IRS. *Coward*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

90. Defendants knowingly and willfully operated their business with a policy of failing to provide Plaintiff and Class Members with wage notices and accurate wage statements, in violation of the NYLL.

***Plaintiff's False Filing Claims***

91. Defendants failed to properly withhold Plaintiff and Class Members wages for tax purposes.

92. From the beginning of his employment up until around November 2024, Plaintiff was compensated with a paycheck of $600.00 accompanied with a paystub with all tax deductions. Separately, Plaintiff received an additional payment of $400.00 in cash, without deductions, in violation of the Internal Revenue Code. Similarly, Class Members were subjected to Defendants' willful filing of fraudulent tax information.

93. Defendants further failed to provide Plaintiff and Class Members with an accurate W-2 tax statement for each tax year during which Plaintiff worked.

94. Plaintiff retained Lee Litigation Group, PLLC to represent Plaintiff, FLSA Collective Plaintiffs, and Class Members in this litigation, and has agreed to pay the firm a reasonable fee for its services.

## STATEMENT OF CLAIM

## COUNT I

## VIOLATION OF THE FAIR LABOR STANDARDS ACT

95. Plaintiff realleges and incorporates all the above allegations as if fully set forth herein.

96. At all relevant times, Defendants were and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiff and FLSA Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

97. At all relevant times, Defendants employed Plaintiff and FLSA Collective Plaintiffs within the meaning of the FLSA.

98. At all relevant times, Defendants had a policy and practice of failing to pay overtime compensation at the statutory rate of one and one-half times the regular rate of pay to Plaintiff and FLSA Collective Plaintiffs for their hours worked in excess of forty (40) hours per workweek.

99. Defendants knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiff and FLSA Collective Plaintiffs the proper overtime premium of one and one-half times the regular rate of pay for their hours worked in excess of forty (40) hours per week when Defendants knew or should have known such was due.

100. Defendants failed to properly disclose or apprise Plaintiff and FLSA Collective Plaintiffs of their rights under the FLSA.

101. As a direct and proximate result of Defendants' willful disregard of the FLSA, Plaintiff and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

102. Due to the intentional, willful, and unlawful acts of Defendants, Plaintiff and FLSA Collective Plaintiffs suffered damages in an amount not presently ascertainable of unpaid overtime compensation and unpaid wages, plus an equal amount as liquidated damages.

103. Records, if any, concerning the number of hours worked by Plaintiff and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiff and FLSA Collective Plaintiffs are in the possession and custody of Defendants. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due.

104. Plaintiff and FLSA Collective Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

**COUNT II**

**VIOLATION OF THE NEW YORK LABOR LAW**

105. Plaintiff realleges and incorporates all the above allegations as if fully set forth herein.

106. At all relevant times, Plaintiff and Class Members were employed by Defendants within the meaning of the NYLL §§ 2 and 651.

107. Defendants willfully violated Plaintiff's and Class Members' rights by failing to pay them the proper minimum wages for all hours worked.

108. Defendants willfully violated Plaintiff's and Class Members' rights by failing to pay them their proper overtime compensation at rates of not less than one and one-half times their regular rates of pay for each hour worked in excess of forty (40) hours in a workweek.

109. Defendants willfully violated Plaintiff's and Class Members' rights by failing to pay them any spread of hours premiums for all their shifts worked in excess of ten (10) hours.

110. Defendants knowingly and willfully failed to provide proper wage and hour notices to Plaintiff and Class Members, as required by the NYLL § 195(1).

111. Defendants knowingly and willfully failed to provide proper wage statements to Plaintiff and Class Members with every wage payment, as required by the NYLL § 195(3).

112. Due to Defendants' NYLL violations, Plaintiff and Class Members are entitled to recover from Defendants their unpaid wages, unpaid overtime compensation, unpaid minimum wages, unpaid spread of hour premiums, statutory penalties, liquidated damages, reasonable attorneys' fees and costs and disbursements of the action, pursuant to the NYLL.

## COUNT III

## CIVIL DAMAGES FOR FRAUDULENT FILING OF INFORMATION RETURNS UNDER 26 U.S.C. § 7434(a)

113. Plaintiff realleges and incorporates all the foregoing paragraphs of this Class and Collective Action Complaint as if fully set forth herein.

114. Under the Internal Revenue Code, "[i]f any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such person may bring a civil action for damages against the person so filing such return." 26 U.S.C. § 7434(a).

115. By failing to provide Plaintiff and Class Members with accurate IRS Forms W-2 for all of the tax years during which they were employed by Defendants and failing to properly record, account for, and report to the IRS all monies paid to Plaintiff and the Class as wages, Defendants filed fraudulent information returns with the IRS, in violation of 26 U.S.C. § 7434.

116. Defendants knew they had a legal duty not to misrepresent to the IRS the amount of money they were paying employees. Defendants' actions were willful violations of, or showed reckless disregard for, the provisions of the Internal Revenue Code.

117. Pursuant to 26 U.S.C. § 7434(b)(3), Defendants are also liable to Plaintiff for reasonable attorneys' fees.

## COUNT IV

## BREACH OF CONTRACT

118. Plaintiff realleges and incorporates all the foregoing paragraphs of this Class and Collective Action Complaint as if fully set forth herein.

119. "In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance … This covenant embraces a pledge that neither party shall do anything

which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract … [T]he duties of good faith and fair dealing … encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included [in the contract].” *511 W. 232nd Owners Corp. v. Jennifer Realty Co*., 98 N.Y.2d 144, 153 (2002).

120. When Plaintiff and Class Members accepted offers of employment form Defendants, the parties entered a contract, and the covenant of good faith and fair dealing implicit therein required Defendants to pay Plaintiff and Class Members in accordance with all applicable laws. This involved, *inter alia*, a duty by abide by the Internal Revenue Code and pay all required FICA taxes.

121. Defendants breached this duty when they decided to pay Plaintiff and Class Members in cash and not file proper W-2. As a result, Plaintiff and Class Members lost part of the benefit of the bargain for which they contracted, suffering a loss in the amount of the FICA taxes that Defendants should have paid on their behalf but did not.

**COUNT V**

**UNJUST ENRICHMENT**

122. Plaintiff realleges and incorporates all the foregoing paragraphs of this Class and Collective Action Complaint as if fully set forth herein.

123. To state a claim for unjust enrichment, a plaintiff must allege that: “(1) the [defendant] was enriched, (2) at [plaintiff's] expense, and (3) that it is against equity and good conscience to permit the [defendant] to retain what is sought to be recovered.” *Georgia Malone & Co., Inc. v Rieder*, 19 N.Y.3d 511, 516 (2012) (internal quotations omitted).

124. Defendants were unjustly enriched when they kept for themselves money that should have been paid to the Internal Revenue Service as Defendants' employer FICA contribution. Such came at the expense of Plaintiff and Class Members because they will either (1) be liable to the IRS for the employer's share or (2) upon retirement suffer from diminished Social Security and Medicare benefits because they did not pay enough into the system.

125. Accordingly, all sums that Defendants should have paid to the IRS should be disgorged from Defendants and transferred to Plaintiff and Class Members.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself, FLSA Collective Plaintiffs and Class Members, respectfully requests that this Court grant the following relief:

a. A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the NYLL;

b. An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

c. An award of unpaid wages, including minimum wages, due under the NYLL;

d. An award of unpaid overtime compensation due under the FLSA and the NYLL;

e. An award of unpaid spread of hours premiums due under the NYLL;

f. Contractual damages for Defendants' failure to keep their promise to abide by the Internal Revenue Code and fund Plaintiff's and Class Members' retirement through FICA contributions;

g. Disgorgement from Defendants of all illegally retained sums that should have gone into FICA contributions;

h. An award of statutory penalties as a result of Defendants' failure to comply with the NYLL wage notice and wage statement requirements;

i. An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay proper wages pursuant to the FLSA;

j. An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay proper wages pursuant to the NYLL;

k. An award of statutory damages to Plaintiff and each Class member under 26 U.S.C. § 7434;

l. An award of pre-judgment and post-judgment interests, costs and expenses of this action together with reasonable attorneys' fees, expert fees, and statutory penalties;

m. Designation of Plaintiff as Representative of the FLSA Collective Plaintiffs;

n. Designation of this action as a class action pursuant to F.R.C.P. 23;

o. Designation of Plaintiff as Representative of the Class; and

p. Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated: January 29, 2026
New York, New York

Respectfully submitted,

By: */s/ C.K. Lee*
C.K. Lee, Esq.

**LEE LITIGATION GROUP, PLLC**
C.K. Lee, Esq. (CL 4086)
Anne Seelig, Esq. (AS 3976)
148 West 24th Street, Eighth Floor
New York, New York 10011
Tel.: (212) 465-1188
Fax: (212) 465-1181
*Attorneys for Plaintiff,*
*FLSA Collective Plaintiffs,*
*and the Class*